# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

### ARMANDO GARCIA - GARCIA,

### Petitioner

### - vs -

### UNITED STATES OF AMERICA

### Respondent

### PETITIONER'S EXHIBIT 

### [ IN RE: 28 U.S.C. §2255 ]

DUE TO PETITIONER GARCIA-GARCIA'S LACK OF NUMEROUS
DOCUMENTS PERTINENT THE UNDERLYING CASE, THIS EXHIBIT
COULD NOT BE RETRIEVED IN SUFFICIENT TIME TO BE MADE A
PART OF THE RECORD IN THIS INSTANT §2255 PROCEEDING.

AS THIS EXHIBIT IS UTILIZED BY CO-DEFENDANTS OF PETITIONER
GARCIA-GARCIA, PETITIONER MOVES TO ADOPT REFERENCE TO SAME.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

ARMANDO    GARCIA - GARCIA,

Petitioner

- vs -

UNITED STATES OF AMERICA

Respondent

PETITIONER'S EXHIBIT 

[ IN RE: 28 U.S.C. §2255 ]

No. 00-1361

UNITED STATES,
Appellee,

v.

MIGUEL VEGA-COLON,
Defendant-Appellant.

No. 00-1456

UNITED STATES,
Appellee,

v.

MIGUEL VEGA-COSME A/K/A MIGUEL BOBOLON,
Defendant-Appellant.

No. 00-1488

UNITED STATES,
Appellee,

v.

ARMANDO GARCIA-GARCIA A/K/A MANDY,
Defendant-Appellant.

No. 00-1548

UNITED STATES,
Appellee.

V.

JUAN ENRIQUE CINTRON-CARABALLO,
Defendant-Appellant.

No. 01-1674

UNITED STATES,
Appellee,

JUAN SOTO-RAMIREZ A/K/A PIPU,
Defendant-Appellant.

---

BEFORE

COFFIN, Senior Circuit Judge
SELYA, LYNCH, Circuit Judges

ORDER OF COURT

Entered: December 10, 2004

Defendants' pro se motion to recall mandate is <u>denied.</u>

By the Court:

Richard Cushing Donovan, Clerk

By:_____

Operation Manager

[cc: Messrs. Anglada-Lopez, Miller, Perez-Sosa, Vega-Pacheco,
Rodriguez-Coss, Vega-Cosme, Vega-Colon, Soto-Ramirez, Garcia-
Garcia, Cintron-Caraballo and Ms's Ramos Grateroles, Morales, Brill
Shein and Velez-Rive]

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

ARMANDO  GARCIA - GARCIA,

Petitioner

- vs -

UNITED STATES OF AMERICA

Respondent

PETITIONER'S EXHIBIT 

[ IN RE: 28 U.S.C. §2255 ]

# Su     eme Court of the United     ates
## Office of the Clerk
## Washington, DC 20543-0001

William K. Suter
Clerk of the Court
(202) 479-3011

February 28, 2005

Mr. Armando Garcia-Garcia
Prisoner ID 14932-069
P.O. Box 1033
Coleman, FL 33521-1033

      Re:  Miguel A. Vega-Cosme, Miguel Vega-Colon, Armando Garcia-
            Garcia, and Juan Soto-Ramirez
            v. United States
            No. 04-8347

Dear Mr. Garcia-Garcia:

    The Court today entered the following order in the above-entitled case:

    The petition for a writ of certiorari is denied.

                    Sincerely,

                    William K Suter

                **William K. Suter**, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO


ARMANDO GARCIA - GARCIA,

Petitioner


- vs -


UNITED STATES OF AMERICA

Respondent


PETITIONER'S EXHIBIT 


[ IN RE: 28 U.S.C. §2255 ]

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

UNITED STATES OF AMERICA

v.

ARMANDO GARCIA-GARCIA,
aka "Mandy"

)
)
)
)
)
)
)

Docket No. 97-0076(DRD)
Defendant No. 008

**PRESENTENCE REPORT**

Prepared for:    Hon. Daniel R. Domínguez
                 U.S. District Judge

                                          Sentencing Date:
                                          10-01-99

Prepared by:     Miriam Figueroa
                 U.S. Probation Officer

                                          Office Location:
                                          Hato Rey, P.R.
                                          (787) 766-5596,5867

Offense:         **Count Two:** 21 U.S.C. §846 - Conspiracy to distribute
                 in excess of five (5) kilograms of heroin, in excess
                 of five (5) kilograms of cocaine, in excess of five
                 (5) kilograms of cocaine base and in excess of one
                 hundred (100) kilograms of marijuana, a Class "A"
                 felony.

Date of Arrest:    April 11, 1997

Custodial Status:  In federal custody since date of arrest.

Identifying Data:

Date of Birth: 03-12-72          Age: 27              Sex: Male

Race: White/Hispanic             Citizenship: U.S. Native

PPI No.: 672 172 MA1             U.S. Marshal No.: 14932-069

.AI: 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                 Other ID No: None

Education: Eleventh Grade        Dependents: Four

Legal Address: Israel Ward, 63 Cuba Street, (Alley #4)
               Hato Rey, Puerto Rico

Detainers:       None known

Codefendants:    William Soto-Enríquez,
                 Aka "William Descamisao"
                 Docket No. 97-0076-01

                 Juan Soto Ramírez,
                 Aka "Pipo"
                 Docket No. 97-0076-02

                 Eduardo Alicea-Torres,
                 Aka "Eggy"
                 Docket No. 97-0076-03

                 Ramón L. Fernández-Malavé,
                 Aka "Porcel"
                 Docket No. 97-0076-04

                 Carmelo Vega-Pacheco,
                 Aka "Popeye"
                 Docket No. 97-0076-05

                 Euclides Carbonell-Torres,
                 Aka "Cibi"
                 Docket No. 97-0076-06

                 Edwin Flores Encarnación,
                 Aka "Lambe"
                 Docket No. 97-0076-07

                 Luis Torres-Alicea,
                 aka "Pito Salsa"
                 Docket No. 97-0076-09

                 René González-Ayala,
                 Docket No. 97-0076-10

                 John Doe,
                 Aka "Yye"
                 Docket No. 97-0076-11

                 José Luis De León-Maysonet
                 Docket No. 97-0076-12

                 Wayne Ealois Huggins
                 Docket No. 97-0076-14

                 Miguel A. Rivera-Santos,
                 Aka "Guel"
                 Docket No. 97-0076-15

                 Miguel Vega-Cosme,
                 Aka "Miguel Bobolón"
                 Docket No. 97-0076-18

Miguel Vega,
Aka "Mickey"
Docket No. 97-00076-19

Juan E. Cintrón-Caraballo
Docket No. 97-00076-20

Alberto Santiago-Figueroa,
Aka "Albert"
Docket No. 97-00076-21

Juan Antonio Rodríguez-López,
Aka "Tony, El Bebo"
Docket No. 97-00076-22

| Assistant U.S. Attorney | Defense Counsel (Appointed) |
| --- | --- |
| Jacabed Rodríguez-Coss, Esq. | José Romo-Matienzo, Esq. |
| Federal Office Bldg., Rm. 452 | 54 Coll and Toste Street. |
| 150 Carlos Chardón Ave. | 286. Baldrich |
| Hato Rey, Puerto Rico | Hato Rey, Puerto Rico 00918 |
| (787) 766-5656 | (787) 753-7600 |

Date report prepared:    September 3, 1999

Revised:    Mandatory Minimum: Ten (10) years

3

## PART A.   THE OFFENSE

### Charge(s) and Conviction(s)

1. The defendants were the subject of a two count Superseding Indictment rendered by a District of Puerto Rico Grand Jury on December 14, 1998. **Count One** charges that from on or about January 1, 1990, and continuing until on or about March 7, 1994, in the District of Puerto Rico and elsewhere, William Soto-Enríquez, aka "William Descamisao", and Juan Soto-Ramírez, aka "Pipo", aiding and abetting each other, did engage in a continuing criminal enterprise, as this term is defined in 21 U.S.C. § 848(c), in that William Soto-Enríquez and Juan Soto-Ramírez did violate the provisions of 21 U.S.C., subchapter I as alleged in Count Two of the indictment, which violations were part of a continuing series of violations of subchapter I, undertaken by William Soto-Enríquez and Juan Soto-Ramírez; in concert with at least five other persons with respect to whom the defendant, William Soto-Enríquez, occupied a position as the principal administrator, organizer and leader of the enterprise, and with respect to whom defendant, Juan Soto-Ramírez, occupied a position as administrator, organizer, supervisor, and manager, and from which continuing series of violations, the defendants herein obtained substantial income and resources. All in violation of 21 U.S.C. §§ 848(a) and (b), and 18 U.S.C. § 2. **Count Two** charges that from on or about January 1, 1990, and continuing until on or about March 7, 1994, in the District of Puerto Rico and elsewhere, William Soto-Enríquez, aka "William

Descamisado"; Juan Soto-Ramírez, aka "Pipo"; Eduardo Alicea-Torres, aka "Eggy"; Ramón L. Fernández-Malavé, aka "Porcel"; Carmelo Vega-Pacheco, aka "Popeye"; Euclides Carbonell-Torres, aka "Clibi"; Edwin Flores-Encarnación, aka "Lambe"; Armando García-García, aka "Mandy"; Luis Torrens-Alicea, aka "Pito Salsa"; René González-Ayala; John Doe, aka "Yun"; José Luis De León-Maysonet; Wayne Falois-Huggins; Miguel A. Rivera-Santos, aka "Guel"; Miguel Vega-Cosme, aka "Miguel Bobolón"; Miguel Vega, aka "Mikey"; Juan E. Cintrón-Caraballo; Alberto Santiago-Figueroa, aka "Albert"; and Juan Antonio Rodríguez-López, aka "Tony, El Bebo"; did conspire and agree with each other, and with divers other persons to the grand jury known and unknown, to commit an offense against the United States, to wit, to distribute multi-kilogram quantities of controlled substances, that is to say, in excess of five (5) kilograms of heroin, in excess of five (5) kilograms of cocaine, in excess of five (5) kilograms of cocaine base, and in excess of one hundred (100) kilograms of marihuana, as prohibited by 21 U.S.C. § 841(a)(1). All in violation of 21 U.S.C. § 846.

2. **On June 25, 1999, the defendant was found guilty by jury trial as to Count Two of the indictment.**

3. On November 30, 1998, Edwin Flores-Encarnación pled guilty to Count Two and was sentenced to 121 months of imprisonment. On November 20, 1998, co-defendant Luis Torréns-Alicea pled guilty to Count Two of the indictment and is scheduled for sentenced on October 7, 1999. On August 3, 1999, co-defendant

2

Alberto Santiago-Figueroa pled guilty as to Count Two and is scheduled for sentence on October 21, 1999. Co-defendants, Euclides Carbonell-Torres, Wayne Falois Higgins, Miguel A. Rivera-Santos, and Juan A. Rodríguez-López, are pending trial. All other co-defendants were found guilty by jury trial on June 25, 1999, and are pending to be sentenced.

4. **Related Cases**

None.

5. **The Offense Conduct**

According to all available official information, the main object of the instant conspiracy was to distribute heroin, cocaine, cocaine base (crack cocaine), and marihuana, at different drug points for significant financial gain or profit. It was part of the conspiracy that the defendants and their co-conspirators would purchase multi-kilogram quantities of heroin, cocaine, and marihuana at wholesale prices. They would cut and divide multi-kilogram quantities of heroin, cocaine, and marihuana in small packages for subsequent sale at the drug points. It was further part of the conspiracy that the defendants would cook part of the purchased cocaine and create cocaine base (crack cocaine), which was also packaged in small packages for subsequent sale at drug points. It was further part of the conspiracy that they would use residences and other locations in order to store and package the controlled substances. It was further part of the conspiracy that the defendant would sell packaged quantities

3

of heroin, cocaine, cocaine base (crack cocaine), and marihuana in small quantities to customers at drug points.

6. The members of the organization had the following different roles and perform different tasks in furtherance of the conspiracy:

7. William Soto-Enriquez, aka "William Descamisao", was the principal leader and organizer of the drug-trafficking organization. He did lead, organize, control, enforce through the use of violence, and supervise the sales of controlled substances at drug points located at the "Barriada Bitumul", Sector Israel, Hato Rey, Puerto Rico. He did direct and supervise numerous subordinates, whose principal tasks were: (a) to supply sellers with the drug to be sold and collect the proceeds derived from their sale at drug points; (b) to package drugs for subsequent sale at drug points; (c) to provide protection to both himself and the illegal narcotics being sold at the drug points; and (d) to sell narcotics at drug points. He also participated in the packaging of the narcotics for distribution at drug points, personally delivered packaged narcotics to his runners and sellers, and, at times, collected proceeds derived from drug sales.

8. Juan Antonio Rodriguez-López, aka "Tony El Bebo", was one of the leaders and organizers of this conspiracy. He did lead, organize and control, enforce through the use of violence, and supervise the sales of controlled substances at drug points

located at the "Barriada Bitumul", Israel Sector, Hato Rey, Puerto Rico.

9. Juan Soto Ramírez, aka "Pipo", was one of the leaders and supervisors of the drug-trafficking organization. He did lead, enforce through the use of violence, and supervise the sales of controlled substances at drug points located at the "Barriada Bitumul", Israel Sector, Hato Rey, Puerto Rico. He did direct and supervise numerous subordinates whose principal tasks were: (a) to supply sellers with the drugs to be sold and collect the proceeds derived from their sale at drug points; (b) to package drugs for subsequent sale at drug points; (c) to provide protection to both himself and the illegal narcotics being sold at drug points; and (d) to sell narcotics at drug points. He would also participate in the packaging of the narcotics for distribution at drug points, personally deliver packaged narcotics to his runners and sellers, and, at times, collect proceeds derived from drug sales.

10. Mr. Soto-Enriquez would employ runners for the drug-trafficking organization. These runners would receive packaged narcotics from Mr. Soto-Enriquez and deliver them to the sellers for sale at the drug points and would collect the proceeds derived from sales already completed by the sellers. Runners would be responsible for the status of the inventory of illegal narcotics sold at the drug points and for supervising the operations at a given drug point. He also had

11. Co-defendants Euclides Carbonell-Torres, aka "Clibi", Miguel Vega, aka "Mickey"; Armando García-García, aka "Wandy", René González-Ayala; José Luis De León-Maysonet, aka "Luis Tota"; triggermen who were part of the drug-trafficking organization. These men would possess, carry, use and brandish firearms using them to provide protection to the leader of the organization as well as to the drug operations of the conspiracy from rival-drug trafficking organizations. Among those identified as triggermen were: co-defendants Edwin Flores-Encarnación, aka "Lambe"; Eduardo Alicea-Torres, aka "Eggy"; Ramón Fernández-Malavé, aka "Porcel"; Carmelo Vega-Pacheco; Armando García-García, aka "Wandy"; René González-Ayala; Juan Cintrón-Carabello; Wayne Ealois-Huggins; José Luis De León-Maysonet, aka "Luis Tota"; Luis Torrens-Alicea, aka "Pito Salsa"; and an unindicted co-conspirator, Victor Negrón-Maldonado, aka "Pitococito". Finally, drug sellers were also part of the drug-trafficking organization. The drug sellers would sell heroin, cocaine, cocaine base (crack cocaine) and marihuana at the "Barriada Bitumul" drug points. Co-defendants Miguel A. Rivera-Santos, aka "Guel"; Armando García-García, aka "Wandy"; José Luis De León-Maysonet, aka "Luis Tota"; Ramón Fernández-Malavé, aka "Porcel", Carmelo Vega-Pacheco, aka "Popeye", and defendant Edwin Flores-Encarnación, aka "Lambe", were some of the drug sellers of the drug trafficking organization.

Wayne Ealois-Huggins and Edwin Flores-Encarnación, aka "Lambe", would package narcotics in small containers for sale at the drug points.

12. Co-defendants Juan Cintrón-Carabello; Alberto Santiago-Figueroa, aka "Albert", and Miguel Vega-Cosme, aka "Miguel Bobolón", ran drug points within the "Barriada Bitumul" in Hato Rey, Puerto Rico.

13. According to the government, the defendant **Armando García-García**, was involved in the murder of César Oscar Nazario.

14. On April 11, 1997, the defendant, Armando García-García, was arrested and ordered preventively detained. On April 15, 1997, he was ordered detained without bail by the Hon. Justo Arenas, U.S. Magistrate Judge.

**Adjustment for Obstruction of Justice**

15. There is no information that the defendant impeded or obstructed justice.

**Adjustment for Acceptance of Responsibility**

16. An interview was sustained with the defendant at the Metropolitan Detention Center in Guaynabo, Puerto Rico. He indicated that he is innocent and did not participate in the offense conduct since he was incarcerated for local charges from 1991 to 1992. The defendant further informed that in 1993, he went to live to Arecibo, Puerto Rico and did not engage in any drug trafficking. As such, he informs that this case is related to his local case in San Juan, Puerto Rico.

Offense Level Computation

17. The guideline for a 21 U.S.C. § 846 offense is found in Section 2D1.1 of the guidelines. However, based on the nature of the instant case, whereid a victim was killed under circumstances that would constitute murder under Title 18 U.S.C. § 1111, the cross reference in USSG §2D1.1(d)(1) requires the application of USSG Section 2A1.1. Therefore, the base offense level is 43.    43

18. Specific Offense Characteristics: None    +0

19. Adjustment for Role in the Offense: None.    0

20. Victim Related Adjustment: None.    0

21. Adjustment for Obstruction of Justice: None.    0

22. Adjustment for Acceptance of Responsibility: The defendant has not accepted responsibility for his involvement in the instant offense. As such, no reduction is authorized. Guideline § 3E1.1.    0

23. TOTAL OFFENSE LEVEL: 43    43

PART B.  THE DEFENDANT'S CRIMINAL HISTORY

Juvenile Adjudications

24. None known.

8

---

Criminal Convictions

| No. | Date of Arrest | Conviction/Court | Date Sentence Imposed/Disposition | Guideline/Points |
|---|---|---|---|---|
| 25. | 10-22-90 Age: 18 | Violation Art. 256 reduced to misdemeanor; San Juan Superior Court, Puerto Rico. Cr. No. KAP9OG0046. | 12-28-90: Pled guilty to reduced charge. 05-10-91: Sentenced to an imprisonment term of six (6) months. 08-04-91: Released from custody without parole. | 4A1.1(b)  2 |

The charge reads that on October 22, 1990, the defendant used violence against Jaime R. Velázquez, by hitting him, thus preventing that this public official perform his duties, in arresting a minor.

| No. | Date of Arrest | Conviction/Court | Date Sentence Imposed/Disposition | Guideline/Points |
|---|---|---|---|---|
| 26. | 09-05-91 Age: 19 | Violation Art. 401, Controlled Substance Law; reduced to Art. 406 (Attempted Possession with intent to distribute) San Juan, Superior Court, Puerto Rico. Cr. No. KSC9100668. | 09-25-92: Pled guilty and sentenced to an imprisonment term of one (1) year. 04-21-93: Released from custody without parole. | 4A1.1(b) |

9

The charge reads that on September 4, 1991, the defendant possessed with intent to distribute heroin without having the legal authority to do so.

| 27. | 08-13-93<br>Age: 21 | Violation<br>Art. 401,<br>Controlled<br>Substance<br>Law, reduced<br>to Art. 404<br>(Two Counts)<br>Ariecibo<br>Superior<br>Court,<br>Puerto Rico.<br>Cr. No.<br>CSCG932449<br>and 50. | 12-06-93: Pled<br>guilty.<br>04-14-94:<br>Sentenced in<br>absentia to an<br>imprisonment term<br>of two (2) years<br>as to each count,<br>to run<br>concurrently with<br>each other.<br>04-25-96:<br>Transferred to a<br>local halfway<br>house.<br>04-11-97:<br>Expiration date<br>and arrested for<br>instant offense. | 4A1.1(a)<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>3 |

The charges read that on August 13, 1993, the defendant possessed with intent to distribute cocaine and marihuana, without having the legal authority to do so.

28. The subtotal of criminal history points is 7. Since the defendant committed the instant offense while under a criminal justice sentence, two (2) points are added pursuant to USSG §4A1.1(d). As the defendant committed the instant offense less than two years after release from imprisonment on the instant offense of September 25, 1992, one (1) point is added pursuant to USSG §4A1.1(e).

10

## Criminal History Computation

29. The total of the criminal history points is 10. According to the Chapter Five Sentencing Table, 10 to 12 criminal history points establishes a criminal history category of V.

## Other Criminal Conduct

30. On September 25, 1992, the defendant was sentenced to a fine of $25.00 or one day in jail for every $5.00 not paid, relative to four traffic law violations, to run consecutively to each other. Pursuant to USSG § 4A1.2(c)(2), these type of offenses are never counted.

## PART C. SENTENCING OPTIONS

## Custody

31. Statutory Provisions: The statutory maximum term of imprisonment is life. The minimum term is ten (10) years. 21 U.S.C. § 841(b)(1)(A).

32. Guideline Provisions: Based upon a total offense level of 43 and a criminal history category of V, the applicable guideline term in this particular case is life imprisonment. As the applicable guideline range falls within the purview of Zone D of the Chapter Five Sentencing Table, guideline provisions require that the maximum term be satisfied by a sentence of imprisonment. Guideline § 5G1.1(f).

## Supervised Release

33. Statutory Provisions: The Court must impose a term of supervised release of at least five (5) years. 21 U.S.C. § 841(b)(1)(A).

11

34. Guideline Provisions: The Court shall order a term of supervised release to follow imprisonment when a sentence of imprisonment of more than one year is imposed or when required by statute. The term of supervised release imposed shall in no event be less than any statutorily required term. Guideline §§ 5D1.1(a) and 5D1.2(b). The Court shall impose a supervised released term of at least five (5) years. 21 U.S.C. § 841(b)(1)(A).

Probation

35. Statutory Provisions: The defendant is not eligible for probation as the offenses of conviction expressly preclude probation as a sentencing alternative. 18 U.S.C. §§ 3561(a)(2).

PART D. OFFENDER CHARACTERISTICS

Family Ties, Family Responsibilities, and Community Ties

36. The defendant was born on March 12, 1972, in Arecibo, Puerto Rico to the union of Luis Garcia, age 45, a medical chemist and Mercedes Garcia, age 42, a bakery shop employee. Although the defendant is an only child, he informed having two maternal siblings who were identified as Miguel Angel and Caroline Mercedes, ages 17 and 7, respectively. The defendant also has three paternal siblings; Glenda, age 23; Luis Daniel, age 20; and Johana Garcia, age 18. All siblings reside in Puerto Rico. The defendant advised having been reared in San Juan, Puerto Rico by his mother since his parents separated when he was one year old. He informed that he hardly had any

communication with his father and he never provided child support. As such, his mother raised him through hard work. Defendant indicated that he resented his father's attitude, however, at present he maintains a better relationship with him. Defendant indicated that he had several step-fathers who were not abusive toward him, but his mother had no luck in maintaining a stable relationship. When he was young this situation affected him emotionally, and he began to portray behavioral problems at school. Nevertheless, the defendant informed that he maintained a good relationship with his mother and siblings, which still prevails. An interview was sustained with defendant's mother who described her son as a good person who always looked after his family's well being. She indicated that while living with her he never portrayed any behavioral problems since she was very strict and encouraged him to work, but once he left her home, he changed.

37. The defendant informed having sustained a consensual relationship with Wanda E. Ortiz from 1989 to 1998, wherein three children were procreated, they are: Armando, age 4; Brian, age 3; and Josua Armando, age 2. The defendant informed that he also raised his step-daughter, Carla Mariel Ortiz, age 10, since she was a few months old. The defendant also has a five (5) year old daughter, Greona Mercedes Garcia, product of an extra-marital affair he sustained with Haydee

Acevedo. Attempts were made to contact Ms. Ortiz, however, same was unfeasible.

**Mental and Emotional**

38. According to the defendant, when he was in the 8th grade, he was referred to a psychologist by the school because of behavioral problems. After approximately four (4) months of treatment, he was discharged. He could not recall the name of the psychologist for verification.

**Physical Condition, Including Drug Dependence and Alcohol Abuse**

39. The defendant stands 5'10" tall, weighs approximately 215 pounds, has brown eyes and black hair. According to the defendant he has a tattoo in his back with his mother's name and has scars on his left arm, right shoulder and abdomen, product of six gun shot wounds. As a result, a lung, spleen and three fourths (3/4) of his liver were removed. The defendant was hospitalized at the Arecibo Regional Hospital for a period of four months and he described his recovery as fair. The defendant further informed that he has been suffering from asthma since childhood. Prescribed medication is taken when necessary. Relative to drug use, the defendant indicated that he began to consume marihuana at the age of 17, five days a week. He also informed having used cocaine on a social basis for approximately four years, last time being prior to his federal arrest. The defendant advised that while

in was at the local halfway house, he was referred to DESCA, a government drug treatment program, but he discontinued same due to his arrest for the instant offense. Excessive alcohol consumption was denied.

**Education and Vocational Skills**

40. The defendant completed the eleventh grade at the Miguel Such Vocational School located in Rio Piedras, Puerto Rico. He indicated that while serving time at MDC, Guaynabo, he has engaged in the Parenting and Drug Program, and took a card making course. Additionally, he was recognized by the institution for having participated in the renovation of Unit 2B.

**Employment Record**

41. The defendant has been in federal custody since April 11, 1997. Prior to his arrest, that is from June to December 1996, the defendant indicated having worked as an assistant for Central Insulation, located in Barceloneta, Puerto Rico, earning minimum wage.

42. The defendant further advised that from 1994 to 1996, he worked at José Luis Auto Body Shop, in Hatillo, Puerto Rico, earning $600 a month. Same was discontinued for a better employment opportunity.

**PART E.   FINES AND RESTITUTIONS**

43. **Statutory Provisions:**   The maximum fine is $4,000,000. 21 U.S.C. § 841(b)(1)(A).

44. A special monetary assessment in the sum of $100 is mandatory as to Count Two. 18 U.S.C. § 3013.

45. **Guideline Provisions:** The fine range for this offense is from a minimum of $25,000 to a maximum of $4,000,000. Guideline §§5E1.2(c)(3), Fine Table and 5E1.2(c)(4).

46. Subject to the defendant's ability to pay, the Court shall impose an additional fine amount that is at least sufficient to pay the costs to the government of any imprisonment, probation, or supervised release, pursuant to Section 5E1.2(i). The most recent advisory from the Administrative Office of the United States Courts, dated April 12, 1999, suggests that a monthly cost of $1,826.99 be used for imprisonment, $1,326.78 for offenders in community corrections centers, and $253.29 for supervision.

**Defendant's Ability to Pay**

47. Based upon the financial statement submitted by the defendant, he has been serving in custody since April 11, 1997. As such, he has not been generating any monthly income. Nevertheless, as assets the defendant informed having a plot of land in the Dominican Republic valued at approximately $9,000. As liabilities, he indicated having an outstanding balance of $225 with "Mueblerias Mendoza" (a furniture store).

48. Based upon the defendant's financial profile, it appears that he does have the ability to pay a fine. If the Court after review of the financial disclosure makes a finding that the imposition of a fine within the required range is not viable, the Court may impose a lesser fine or waive the imposition of the same. USSG § 5E1.2(f).

**PART F. FACTORS THAT MAY WARRANT A DEPARTURE**

49. The probation officer has not identified any information that would warrant a departure from the guidelines.

Respectfully submitted,

CARLOS D. RODRIGUEZ, CHIEF
U.S. PROBATION OFFICER

Miriam Figueroa
U.S. Probation Officer

Approved:

Eva M. Maldonado-Renta
Eva M. Maldonado-Renta
Assistant Deputy Chief
U. S. Probation Officer

MF/isd

16

17

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

ARMANDO   GARCIA – GARCIA,

Petitioner

– vs –

UNITED STATES OF AMERICA

Respondent

PETITIONER'S EXHIBIT 

[ IN RE: 28 U.S.C. §2255 ]

1
2
3
4  IN THE UNITED STATES DISTRICT COURT FOR THE
   DISTRICT OF PUERTO RICO
5
6  UNITED STATES OF AMERICA,
7        Plaintiff,
8  vs.                          CR. NO: 97-076(DRD)
9  WILLIAM SOTO BENIQUEZ, ET AL.,
          Defendants.
10
11                        TRIAL
12
13     BE IT REMEMBERED that the above entitled action came on
14  for hearing before the HONORABLE DANIEL R. DOMINGUEZ, sitting at
15  Hato Rey, Puerto Rico, on the 24th day of March, 1999.
16     All parties and their counsel present as before.
17
18
19
20
21
0
19
18
17
16
15
14
13
12
11
10
9
8
7
6
5
4
3
2
1

25
24
23  ARTHUR G. PINEDA, OCR
22  Federal Building, Rm. G-40
21     150 Chardon Avenue
   Hato Rey, Puerto Rico 00918
19     (787) 766-4319

---

84

1  Court is can that be introduced into evidence to prove a
2  potential overt act.
3     MR. MIRANDA CORRADA:  Your Honor, with all due respect,
4  I have another concern and I'm certainly going to read these
5  cases that have been cited by my sister from the government.
6     However, my problem and it's more in the nature of
7  Bruton problem.  How was I notified?
8     THE COURT:  There is a Bruton only if that document
9  says something about your client.
10    MS. RODRIGUEZ:  He's a co-defendant.
11    MR. MIRANDA CORRADA:  Well, Your Honor, I'm not so
12  certain and again because I'm not certain I am certainly going to
13  read these cases but since the Court was going to read them --
14    THE COURT:  I am not prepared to give a decision on the
15  matter.
16    MR. MIRANDA CORRADA:  I just wanted to bring it to the
17  Court's attention so that you're aware of my concern.  I am
18  certainly not in a position right now to put my hand in the fire
19  for that proposition.  However, I do have a concern.
20    MR. ANGLADA:  If I may address the Court.
21    THE COURT:  Brevity is a virtue.
22    MR. ANGLADA:  Well, I may not address the Court then.
23    THE COURT:  No, brevity is a virtue.
24    MR. ANGLADA:  It's a matter that concerns -- the
25  government of the United States when they do indict a group of

85

1  defendants and there has been underlying state proceedings where,
2  A, no probable cause has been found; B, where defendants have
3  been acquitted; C, where they have entered pleas for lesser
4  offenses and/or misdemeanor, then they move in limine as they did
5  in 95-029 before Judge Fuste. In the bottom of '95, then they
6  move for a motion for limine, and they castrate defendants from
7  bringing to court the acquittal, the dismissal. No probable
8  causes, lesser offenses.
9      But when they do pick and choose and they bring a
10 particular indictment where it happens by virtue of coincidence
11 that no acquittal, no dismissal at the time of Rule six and Rule
12 23 in local proceedings, plea for conviction for lesser offense
13 then there is no motion for limine. So, what I'm saying is that
14 the government is bringing this matter depending on the
15 convenient for the government.
16     THE COURT: That's their job.
17     MR. ANGLADA: Well, it's not a matter of their job when
18 they do have --
19     THE COURT: You're doing yours.
0      MR. ANGLADA: When they do have -- when they are
21 blessed by the two sovereigns. Under this Circuit Court there
22 are other circuits that do believe differently and then they do
23 have a state agent and they have a state agency and then they
24 pick and choose, Your Honor. And that is the problem.
25     The problem is that upon that forum there may be a

86

1  motion in limine. If there was an acquittal or a dismissal or a
2  no probable cause found at the time of the alleged -- at the time
3  of the preliminary hearing, at the time of the preliminary
4  hearing de Novo or at the time of trial. But in this particular
5  indictment, this particular government presentation decided not
6  to do in limine and then if we have to live with all the plea
7  agreements of all the indictments why don't we do a trial by
8  computer. We sit down at a terminal and we run a trial on a
9  computer.
10     And then this is all a show, Your Honor, because
11 what kind of fairness is going to preside on defendant A or
12 defendant B, or defendant B, that five years ago for convenience,
13 Your Honor, because in a state court everyone knows that an
14 Article Eight of the weapons law is ten years of prison. And
15 everyone, everyone knows that if you enter a plea for an Article
16 Seven misdemeanor you take six months of probation. And the same
17 goes for drugs and the same goes for murder you go down to
18 homicide, involuntary manslaughter and it's not fair.
19     Six years from now I enter a plea today on Article
20 Seven weapons law or an Article 404 controlled substance or
21 involuntary manslaughter instead of murder in the first degree.
22 And six years from now I am going to be stuck with my own
23 admission, six years from now in another jurisdiction before
24 another sovereign.
25     THE COURT: That's why these cases are going to orient

87

1  me. They're going to orient me to see if I can do it or not.
2  MS. RODRIGUEZ: Your Honor, the last statement by
3  counsel is what is correct, not his opening statement. The last
4  statement by counsel.
5  What we are seeking to introduce is the admissions
6  of these defendants before a different forum with respect to
7  overt acts that we proved here they committed. We are not
8  attempting to introduce a previous conviction. There is a big
9  difference. What the United States has sought to exclude in
10  prior trials has been verdicts of other juries because that would
11  be to take away the role of the jury here which is to accept the
12  credibility of these witnesses and determine the culpability of
13  the defendants and that is not what we're seeking to do here.
14  What we're seeking to do here, is something very
15  different, it is to admit the various statements made by these
16  defendants in another forum in another place, anywhere. It
17  doesn't matter where the admission was made. The fact is that it
18  was made by a defendant. And the rules provide that those
19  admissions are admissible against them even if they were made
20  five years ago, ten years ago, whenever they were made.
21  THE COURT: There is no jury here.
22  MS. APONTE CABRERA: I know, Your Honor.
23  THE COURT: There is no jury here.
24  MS. APONTE CABRERA: I would like for the record to say
25  that the same process in this case was someone to oppose my

88

1  client in 97-72 from bringing evidence of being acquitted in
2  state court.
3  THE COURT: That's what she said.
4  MS. RODRIGUEZ: That's what I said.
5  MS. APONTE CABRERA: But Your Honor, the fact is that
6  there is a case of Boykin versus Alabama, which is a Supreme
7  Court case. That it is unacceptable to accept a plea unless
8  there is a full understanding, where there is evidence of a full
9  understanding of what the plea conduct and its consequence. And
10  without having the transcript to know whether the judge informed
11  any of the defendants that pled, that this plea would be used
12  against them in federal court I submit that it is unadmissible
13  and this Supreme Court said it.
14  THE COURT: Good. So let me hear that case.
15  MS. APONTE CABRERA: B-O-Y-K-I-N versus Alabama. 395
16  U.S.238, 89 Supreme Court 1709, and in Krulewich --
17  THE COURT: 89 Supreme Court.
18  MS. APONTE CABRERA: 1709. And Krulewichch versus
19  United States.
20  THE COURT: Spell that please.
21  MS. APONTE CABRERA: K-R-U-L-E-W-I-C-T-H versus United
22  States, 336 U.S. 440. The Supreme Court says, Your Honor, that
23  it's naive to expect an instruction. And I'm quoting, this in
24  the sense that since my client did not plea, if the Court were to
25  give an instruction that the admissions were only to be used

1 against the parties that made the admission and not the

2 co-defendants, that type of curative instruction.

3 I'm submitting to the Court that the Supreme Court

4 said it was naive to expect that an instruction can cure the

5 effects of a confession or admission of nature intended by the

6 document submitted by the prosecution, of practicing lawyer not

7 to be on litigating pictures.

8 So, I submit to the Court that there is a spill

9 over of having a co-conspirator who is either a partner or an

10 employee, according to the government's version, and admits to

11 having done something, the implication as to the non contesting

12 party can not be cured and overcome by any instruction that the

13 Court can give.

14 MS. RODRIGUEZ: Your Honor, we would to refer the Court

15 to the order entered by Judge Casellas in case number 97-82, U.S.

16 versus Angel Ayala, et al, held before Judge Casellas last --

17 previously this year. Where Judge Casellas ruled that such

18 admissions were in fact admissible.

19 MR. ANGLADA: I will move for the same token the order

20 by Judge Fuste, criminal 95-029, trial number one in the autumn

21 of 1995, without suggesting that is the -- that is persuasive to

22 this Court.

23 There are two additional problems, Your Honor. I

24 have practiced in state court for ten years and I can proffer to

25 this Court under oath that I have never seen a state judge

89

1 presiding over a change of plea in a state proceedings advising

2 any client on any criminal procedure, either murder, drugs,

3 weapons, domestic violence, whatever, about the subsequent

4 consequences of bringing those admissions before a federal court

5 subsequently.

6 And second, Your Honor, we don't have a trial

7 transcript at the time of change of plea where those defendants

8 may have either, A, explained why they are entering a plea; or B,

9 exculpating other defendants. Those two matters are to be

10 considered by the Court.

11 MS. RODRIGUEZ: Your Honor, we provided transcript to

12 the defendants -- if I may be allowed to finish -- we provided

13 transcript of Juan Soto Ramirez as to his change of plea. We

14 provided transcript to Carmelo Vega Pacheco of his change of

15 plea. We provided transcript to Ramon Fernandez Malave of his

16 change of plea, Your Honor.

17 So, Counsel Aponte is correct. We did not provide

18 the transcript to all eleven defendants. We understood that was

19 an admission by each defendant relevant to that particular

20 defendant. And we provided transcript to those counsel. But we

21 can photocopy the same and provide them for the rest of the

22 counsel. We don't understand that will bear upon the ruling of

23 the Court on that issue.

24 MS. RAMOS GRATEROLES: Your Honor, the problem is not

25 the fact that the Court stated before. I was aware of the

90

91

1  convictions of my client. The surprise to us were the facts that
2  in the third amended designation of evidence the government never
3  told us, neither me or any of my co-counsel, that those
4  admissions were going to be entered, and certainly she provided
5  me the transcript of the change of plea, after the third week or
6  fourth week of trial. That's the surprise. That is the surprise
7  of the case.
8      MR. RIVERA ESTEVES: May I inquire?
9      THE COURT: Yes, Mr. Rivera.
10     MR. RIVERA ESTEVES: There were certain alleged overt
11  acts which had been taken under or pending a Petrozziello
12  evaluation by this Court. That's correct. If the circle has not
13  gone full circle.
14     THE COURT: There is no -- there is a Petrozziello
15  determination pursuant to the co-conspirator statement.
16     MR. RIVERA ESTEVES: Exactly.
17     THE COURT: Not necessarily as to the overt act. It
18  can be as to many other things. It can be as to the drugs. It
19  can be as to the overt acts, it can be as to any matter that
.0  relates potentially under 801. 801(d) subsection e.
21     MR. RIVERA ESTEVES: Fine, Your Honor. This is where I
22  have a great concern in addition to what brother and sister
23  counsel here have expressed, but this is where I have great
24  concern as to my client in particular. My client -- there was
25  testimony here, hearsay testimony that involved a co-defendant

92

1  having basically furnished a confession of my client. There is
2  no other evidence really linking my client to an alleged murder.
3      Now, if we're also going to have on top of this an
4  admission, basically, we state that so and so admitted, or so and
5  so was found guilty, the injury, Your Honor, that the act of
6  fairness in the eyes of the jury, the danger involved, the
7  inherent danger of the jury connecting a hearsay admission
8  regarding a confession, regarding someone, which I cannot put on
9  the stand because he's a co-defendant, vis-a-vis, Your Honor,
10  that admission is -- basically the jury can basically decide
11  right there and then guiltiness where it really doesn't belong.
12     And that's just like this Honorable Court to
13  really consider because there really is danger in there. There
14  is a confession, supposedly, which I will not have an opportunity
15  to confront to that confession. Now if on top of that we tell
16  the jury that the person who supposedly my client confesses to or
17  confesses my client has been found guilty or has confessed to a
18  crime.
19     THE COURT: But didn't that come as an admission rather
20  than confession?
21     MR. RIVERA ESTEVES: But the effect, Your Honor.
22     THE COURT: There are two different things.
23     MR. RIVERA ESTEVES: No. My client did not admit.
24     THE COURT: No. It does matter. It does matter
25  because a confession in the traditional sense could be before an

1    officer, before a federal officer.  Yet an admission could be
2    made to a co-conspirator.
3        MR. MIRANDA CORRADA:  But I will not be able to cross
4    examine and sit that person there.
5        MS. RODRIGUEZ:  That is correct.  The argument of
6    Counsel Rivera and which counsel Miranda seems to be joining will
7    be that he will be unable to confront the declarant, that will be
8    the same case if it was a confession and it's admissible.  The
9    rules anticipate that.  The rules provide for that.
10       THE COURT:  The Supreme Court decided a few years ago.
11       MS. RODRIGUEZ:  According to that argument a confession
12   would never be allowed into evidence.
13       MR. RIVERA ESTEVES:  Your Honor had I been timely
14   notified, had designation of evidence been afforded me, which
15   basically states what came out in this trial, I think I would
16   have had ample grounds to ask for a severance.
17       MR. MIRANDA CORRADA:  Severance.
18       MR. RIVERA ESTEVES:  Ample grounds of an act which to
19   date I still insist it does not form part of this conspiracy.
20       MR. MIRANDA CORRADA:  And to answer Sister Counsel, a
21   confession that implicates my client by somebody else is not
22   generally admissible.  And that is Bruton and that is why I
23   couched my original presentation to the Court in those terms.
24   I'm not saying that it's straight Bruton problem but there is
25   certain familiar issues present.

93

1        MS. RODRIGUEZ:  But Bruton also states, Your Honor,
2    that where the defendant does not inculpate a codefendant, there
3    is no grounds for severance.  There are no grounds for severance.
4    That is also what Bruton states and that's the Supreme Court of
5    the United States.
6        MR. RIVERA ESTEVES:  But what we have here, we have
7    here the actual prohibition of going through the kitchen door
8    because someone there is basically stating, oh, he told me that
9    he and he killed him, and that other he is my client.  They're
10   coming in through the kitchen door what they can't get, you know,
11   through the front door.
12       THE COURT:  But my concern over that is that you're
13   arguing against the Supreme Court because that matter has been
14   decided in U.S. versus Villalo.  You're arguing against the
15   Supreme Court.
16       MS. APONTE CABRERA:  Then the rule of criminal
17   procedures establishes that if there are documentation that are
18   to be submitted they have to be designated.  And they did not
19   designate that; moreover, the rules of discovery have been
20   violated because selectively the government decided why I should
21   not have an exhibit discovery and some of the defendants received
22   it.
23            If they chose to go to trial together, unless with
24   specific ruling of the Court that a particular matter was not to
25   be discussed to all at the same time, why did the government keep

94

95

1 from me knowing that the other defendants who pled guilty
2 received some discovery that I did not receive. Why did they
3 preclude me and now they're trying to use that in a trial where
4 my client is charged with somebody else.
5        If they had known this they should have discovered
6 to all of us so that we could have addressed this matter
7 properly. And at this point if the Court or if the government is
8 insisting in bringing this forward or the Court would allow it I
9 would ask the Court for a side bar at that moment and I would
10 request a severance and state my position for the record. And
11 also, Your Honor, as to the last designation, and September 15
12 order of 1998 establishes that the government could not designate
13 as the trial went along after that date. And that is what
14 they're doing now. These documents are not designated. They
15 have not announced any expert that says the signature in that
16 public document accepting a plea is the signature of any of these
17 codefendants or there's been a handwriting sample. Because
18 somebody signed Jose Soto does that mean that Jose Soto Ramirez
19 the same one that is here is the one that signed the paper they
20 have not announced the expert to say it's the same person. So
21 they're going to bring a document with hearsay. So we can assume
22 that it was the same Jose Soto Ramirez who was there, to assume
23 that is the same person that signed the plea in this case.
24        THE COURT: But doesn't that come in under the
25 exception of a public document?

96

1        MS. APONTE CARRERA: No, Your Honor, because in
2 criminal matters the public document exception does not apply and
3 it's specifically laid out in rules, Your Honor.
4        MS. RODRIGUEZ: No, it does not apply to police
5 officer, not to official court documents.
6        MS. APONTE CARRERA: No, Your Honor, to public
7 documents it does not apply in criminal matters.
8        MS. RODRIGUEZ: Your Honor, Rule 803 of the Federal
9 Rules of Evidence, subsection eight, public records and reports,
10 records, reports statement or data compilation in any form of
11 public documents or agencies setting forth, A, specific office A
12 or B, matters preserved pursuant to the duties performed by law
13 as to matters with a duty to report excluding, however, in
14 criminal cases matters occurred by the police officers and other
15 law enforcement personnel.
16        Your Honor, to the extent of my knowledge a Court
17 is not a law enforcement personnel.
18        MS. APONTE CARRERA: Your Honor, although the Court
19 might be from the judicial branch, at the moment that it is
20 taking a plea or giving a sentence it is a enforcing the law.
21        So therefore, one of the two duties of the
22 judicial branch is to enforce the law and that's enforcing the
23 observation by a judge put down in a document qualify as hearsay.
24        MS. RODRIGUEZ: Your Honor, I respectfully suggest that
25 we grant the Court an opportunity to read the cases that we have

1  cited to the Court.

2      THE COURT: That is what I will do.

3  Very well. You're excused for the day. We will

4  see you tomorrow.

5                  **************

---

REPORTER'S CERTIFICATE

1      I, ARTHUR G. PINEDA, Official Court Reporter for the

3  United States District Court for the District of Puerto Rico,

4  appointed pursuant to the provisions of Title 28, United States

5  Code, Section 753, do hereby certify that the foregoing is a true

6  and correct computer aided transcript of proceedings had in the

7  within-entitled and numbered cause on the date hereinbefore set

8  forth; and I do further certify that the foregoing transcript has

9  been prepared by me or under my direction.

                    ARTHUR G. PINEDA
                    Official Court Reporter

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO


ARMANDO   GARCIA - GARCIA,

Petitioner


- vs -


UNITED STATES OF AMERICA

Respondent


PETITIONER'S EXHIBIT 


[ IN RE: 28 U.S.C. §2255 ]

1        IN THE UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF PUERTO RICO

3

UNITED STATES OF AMERICA,        )

4                                 )
                Plaintiff,        )

5                                 )
vs.                               )    CR. NO: 97-076(DRD)

6                                 )
WILLIAM SOTO BENIQUEZ, et al )

7                                 )
                Defendant.        )

8    _____)

9

10                       REBUTTAL

11

12        BE IT REMEMBERED that the above entitled action came on

13   for hearing before the HONORABLE DANIEL R. DOMINGUEZ, sitting at

14   Hato Rey, Puerto Rico, on the 23rd day of June, 1999.

15        All counsel and parties present as before.

16

17

18

19

20

21

22                    ARTHUR G. PINEDA, OCR
23               Federal Building, Rm. G-40
             150 Chardon Ave., Hato Rey, P.R. 00918
24                    (787)766-4319

25



1  that you want to stay calm, remember that he who goes bad he goes

2  rotten is because he wants to.

3              And we have here our mascot.  Can't forget about

4  him.  Not less, not more not less, El Gordo Porcel.  He gets into

5  my room all the time and I'm laughing all day just from his

6  jokes.  Is Victor Negron Maldonado getting pressured not to take

7  the stand?  You judge for yourself.  Is it a coincidence that

8  Victor Negron Maldonado tells you that Armando Garcia Garcia is a

9  drug trafficker, that Garcia Garcia sold drugs at Barriada

10  Bitumul.  Is it a coincident that on September 4th, 1991 Armando

11  Garcia Garcia pleads guilty to possession of heroin?  Is that a

12  coincidence?

13              Is it a coincidence that, he, Victor Negron

14  Maldonado tells you that Ramon Fernandez Malave, also known as

15  Porcel, the one just mentioned in Juan Corozon's letter,

16  committed a murder.  And Ramon Fernandez Malave in fact pled

17  guilty to the murder of Tito Dones Sanchez.  Is that a

18  coincidence?

19              Is it a coincidence that Victor Negron Maldonado

20  tells you Ramon Fernandez Malave is a drug trafficker.  Ramon

21  Fernandez Malave sold drugs for Juan Cintron.  Ramon Fernandez

22  Malave packaged narcotics for me in December of 1992.  And that

23  on April 19th, 1993, Ramon Fernandez Malave is found with 151

24  capsules of crack and 54 bags of cocaine at Callejon Eight in

25  Barriada Bitumul, and a loaded .38 revolver.  Is that a

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

ARMANDO  GARCIA - GARCIA,

Petitioner

- vs -

UNITED STATES OF AMERICA

Respondent

PETITIONER'S EXHIBIT 

[ IN RE: 28 U.S.C. §2255 ]

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

UNITED STATES OF AMERICA,

        Plaintiff,

  vs.               CR. NO: 97-076 (DRD)

ARMANDO GARCIA GARCIA,

        Defendant.

SENTENCING

BE IT REMEMBERED that the above entitled action came on
for hearing before the HONORABLE DANIEL R. DOMINGUEZ, sitting at
Hato Rey, Puerto Rico, on the 28th day of February, 2000.

APPEARANCES:

    For the Plaintiff:  AUSA Jacabed Rodriguez Coss

    For the Defendant:  Jose Romo Matienzo, Esq.

                      ARTHUR G. PINEDA, OCR
                      Federal Building, Rm. G-40
                      150 Chardon Ave., Hato Rey, P.R. 00918
                      (787)766-4319

COPY

---

2

1      THE CLERK:  Criminal Number 97-76, United States of

2  America versus Miguel Vega Cosme, for sentencing.

3      On behalf of the government Assistant U.S.

4  Attorney Jacabed Rodriguez Coss, on behalf of defendant Attorney

5  Jose Romo Matienzo.  Defendant is present in court.

6

7      THE COURT:  Are we ready?

8      MR. ROMO MATIENZO:  Yes, Your Honor.  Before we say we

9  are totally ready, we want to point out that this morning we

10  met -- we had met before at MDC, but this morning we met with our

11  client in the cell block and he pointed out to us that in the

12  PSI, in page eight, that we haven't raised it before because we

13  were unaware of it.  It says that they are applying section --

14  Title 18, Section 3553, and that brings him to a level 49.

15      And as our discussion this morning this law wasn't

16  committed.  So, as to being on level 43 we object to that, back

17  because it would be ex post facto being applied to the case of

18  Armando Garcia.

19      And since there is no discussion in the PSI as to

20  all the other factors that would bring up the minimum guideline

21  of statutory minimum of level 32, ten years, we don't have before

22  us that, I am sure that the prosecutor would come up with

23  arguments that should go up, but we should have the opportunity.

24      THE COURT:  To what?

25      MR. ROMO MATIENZO:  To argue what she's going to bring

1  up because as far as we know he's on level 32, minimal.

2      THE COURT: Thirty-two? He's at 38 to start off.

3      MR. ROMO MATIENZO: Why?

4      THE COURT: He's 38, because the amount of drugs here

5  is definitely 38.

6      MR. ROMO MATIENZO: It doesn't show here in the PSI.

7  That's our point Your Honor. We should have an opportunity to

8  argue because this is going to be with him the rest of his

9  convicted life, Your Honor.

10      THE COURT: Okay. Let's see. Let's see. United

11  States, what is the position of the United States relating to the

12  drug in this case, as to him?

13      MS. RODRIGUEZ COSS: Your Honor, Armando Garcia Garcia

14  was already distributing narcotics in 1994, when this conspiracy

15  began which Barriada Bitumul and continued to do so through the

16  end of the conspiracy as charged in the indictment.

17      In other words, after the famous "palo", the

18  stealing of the two hundred kilos of cocaine and they were

19  brought back to be distributed in Barriada Bitumul this

20  individual was still an active member of the conspiracy. Those

21  narcotics were packaged at his house for distribution at the

22  point that Juan Antonio Rodriguez Lopez controlled.

23      So, clearly incorporating by reference all the

24  arguments we have set forth before this Court in related

25  sentencings for co-defendants who stood trial together with

3

1  Mr. Armando Garcia Garcia we are at level 38.

2      Now, I very respectfully would submit that defense

3  counsel cannot possibly come to a sentencing on a drug case and

4  not be prepared to discuss drug amounts. I can see if we were

5  looking for an enhancement that was unforeseeable or we failed to

6  notify, but this is simple mathematics. First thing you do is

7  you calculate the amount of drugs.

8      THE COURT: All right. The way the Court sees it, in

9  this particular case, it's very easy to reach 38, with the record

10  that this Court has. On the "palo" alone, which was the stolen

11  drugs in Fajardo, on the "palo" alone we have an excess of 150

12  kilos.

13      Now, that doesn't count all the other drugs that

14  was distributed throughout all those points, which testimony of

15  the cooperator clearly indicated was known to all. And there is

16  another way to reaching 38, and that is more than 1.5 kilos of

17  crack cocaine. And that is also very easy to reach in this case

18  because of the amount.

19      Now, in Rivera Maldonado, United States versus

20  Rivera Maldonado, the Court of Appeals clearly set forth what the

21  standards are in a drug conspiracy case as to the amount of

22  drugs. And those are the drugs that he personally handled or

23  anticipated handling, and under the relevant conduct rubric for

24  drugs involved in additional acts of the conspiracy that were

25  reasonably foreseeable by him and were committed in furtherance

4

1 of the conspiracy.

2    So, in other words, it's not just what he himself

3 handled, but what is foreseeable could have been handled in the

4 drug conspiracy. And that's old law. That comes from the cases

5 of United States versus Sepulveda, and if I open the Sepulveda

6 I'm sure that's very old law.

7    Now, in this case most probably he's going to get

8 an enhancement as to weapons also.

9    MR. ROMO MATIENZO: I understand.

10    THE COURT: And the weapons enhancement was in the

11 books way before 1993.

12    MR. ROMO MATIENZO: I understand that.

13    THE COURT: Now, the enhancement which this Court has

14 not applied it, it applied in one case, but when confronted with

15 the issue of enactment the judge changed the sentence, was an

16 amendment that may have occurred after defendant's offense, but

17 before sentencing which would increase the sentence.

18    And for that the Court cites about fifteen cases.

19 U.S. versus Secop, 15 federal 3rd 1180, from the Seventh Circuit.

20 U.S. versus Belle, 991 federal 2nd 1445, Eighth Circuit 1993.

21 U.S. versus Koop 952 federal 2nd, 521, from the Third. U.S.

22 versus Nagi 947 federal 2nd, 211 from the Sixth Circuit. U.S.

23 versus -- 1991 -- U.S. versus Sweetin 933 federal 2nd, 765 from

24 the Ninth Circuit, 1991. And there is even a case from the First

25 Circuit Court which mentions it in passing which is U.S. versus

5

1 Harold Rumford 927 federal 2nd 1048, at page 1042, First Circuit

2 Court 1990.

3    And standing for the proposition that an amendment

4 which occurs after the conclusion of the defendant's criminal

5 conduct, but before sentencing may have expo-facto problems. So,

6 assuming that the Court would not apply this automatic 43 mandated

7 life imprisonment, your client is still looking at a 30 plus two

8 decades. Now, let me hear what the position is for sentencing at

9 this time.

10    MR. ROMO MATIENZO: Well, we would, first of all we

11 would object that on page eight, item or paragraph 17 stays the

12 way it is.

13    THE COURT: That would have to be all amended. They

14 will all have to be amended. The Court would have to order the

15 amendment to a level 38, weapon amendment -- a weapon inclusion,

16 but an exclusion as to automatic 43. Now, considering that do

17 you still insist on a postponement?

18    MR. ROMO MATIENZO: No, I understand that -- well, the

19 evidence at trial, the way the Court sees it, not that we are

20 accepting that was truthful, but that was the evidence that came

21 before the jury and the jury found him guilty. Be it that the

22 case, our objection was as to finding him under level 43, when

23 the law did not apply to him because it wasn't --

24    THE COURT: The Court has determined in other sentences

25 not to apply a level 43. And the only one that the Court reached

6

7

1  a level 43, there were two which the Court reached a level 43,

2  and the Court later changed that.

3       MR. ROMO MATIENZO:  Being that the case we don't -- if

4  the PSI is corrected to that effect we don't have --

5       THE COURT:  What is the position of the United States?

6       MS. RODRIGUEZ COSS:  Well, we are presuming in amending

7  the PSI, as far its base offense level, to 38, a two level upward

8  adjustment applies for the use of weapons.

9       THE COURT:  That's 40.

10      MS. RODRIGUEZ COSS:  We understand that was not

11 reflected on the original.

12      THE COURT:  That's not reflected on the

13      MS. RODRIGUEZ COSS:  Because having established a level

14 43, there is really no need to go beyond that.  But if the base

15 offense level changes, we understand that now it would apply.

16      THE COURT:  Yes, the weapons would apply.  And there

17 was evidence as to weapons because the persons that were killed

18 in the double murder --

19      MS. RODRIGUEZ COSS:  Were killed --

20      THE COURT:  -- wherein the defendant was, according to

21 the evidence, a participant.

22      MS. RODRIGUEZ COSS:  Right.  He's accused of

23 participating in the murder of Oscar Nazario who was killed on

24 October of 1993, Your Honor.

25      THE COURT:  He was the police agent, right?

8

1       MS. RODRIGUEZ COSS:  No, sir, this is -- that was a

2  member of an opposing gang.

3       THE COURT:  This is Oscarito?

4       MS. RODRIGUEZ COSS:  Oscarito.

5       THE COURT:  This was the gentleman who was killed in

6  the shopping area, food shopping area?

7       MR. ROMO MATIENZO:  No.

8       MS. RODRIGUEZ COSS:  Near Floral Park.

9       THE COURT:  Yes.  This was the gentleman that was --

10 yes.  All right.  Fine.

11      MS. RODRIGUEZ COSS:  He was the 16 year old, Your

12 Honor, if the Court recalls who had his name tattooed on his

13 person.

14      THE COURT:  Yes.

15      MS. RODRIGUEZ COSS:  We specifically would like to hear

16 defense counsel's position as to the two level enhancement as to

17 weapons.

18      THE COURT:  What is the position of the defendant,

19 first as to the amount of drugs; and second, the amount of drugs

20 that was set forth in the testimony by the two conspirators that

21 testified.  Are you going to dispute that the drug reached a 38

22 under the applicable jurisprudence?

23      MR. ROMO MATIENZO:  Well, Your Honor, as to the drugs

24 and as to the weapons that evidence was before the Court in the

25 trial, not that we are accepting that was truthful that he had

9

```
 1    the drugs or that he had the -- that it came before the Court,
 2    yes, it did.
 3              THE COURT:  It was there.
 4              MR. ROMO MATIENZO:  Yes, it was.
 5              THE COURT:  There was evidence for the Court to
 6    conclude one of two scenarios as to the weapon.  Either that your
 7    client used the weapon or that your client -- or that a
 8    co-conspirator used a weapon in this case, and your client was
 9    associated with that weapon, right?
10              MR. ROMO MATIENZO:  That was evidence that came before
11    in trial, yes, Your Honor.
12              THE COURT:  In other words, that when a weapon was
13    possessed by a co-defendant the enhancement may be applied if the
14    possession was reasonably foreseeable to the defendant in
15    connection with the joint undertaken criminal activity.  You
16    understand that the enhancement in this case for weapons could be
17    two ways, either because he used it himself or because a
18    co-defendant used it in connection with the joint undertaking of
19    the criminal activity?
20              MR. ROMO MATIENZO:  Yes, I understand.  We had
21    exception to the presentence report.  I believe some of it has
22    been corrected, but as to the --
23              THE COURT:  This Court orders that the presentence
24    report be amended in everything that reflects that a 43 is
25    mandated pursuant to section 2D1.1, 2D1.1D1, requiring a cross
```

10

```
 1    reference to Title 18 U.S.C. 1111.  In other words, the mandated
 2    life sentence is to be stricken from the presentence report.
 3    That's the position of the Court.
 4              MR. ROMO MATIENZO:  Thank you, Your Honor.
 5              THE COURT:  All right.  Now, the other matter is that
 6    the presentence report does not mention weapons, but it does not
 7    mention weapons because they had arrived at a higher level.  Now,
 8    it's going to be weapons.  It's still going to be a two point
 9    enhancement.  Because either there was sufficient evidence that
10    he used the weapon or that a co-defendant was in possession of a
11    weapon and used the weapon, and that was foreseeable by the
12    defendant.  What is your position as to that?
13              MR. ROMO MATIENZO:  We understand the Court's position
14    and that's the way it is.
15              THE COURT:  Okay.  There was evidence to that effect?
16              MR. ROMO MATIENZO:  Yes, there was evidence, but we --
17              THE COURT:  I'm not stating that you should accept that
18    the evidence is true or that the evidence occurred.  I'm only
19    asking was their evidence on the record to maintain that
20    conclusion.
21              MR. ROMO MATIENZO:  Yes, there was.  There was.
22              THE COURT:  And was there evidence on the record to
23    maintain the conclusion that it was 38?  That the level of drugs
24    attained mandates a 38?
25              MR. ROMO MATIENZO:  There was evidence, Your Honor.
```

11

1   THE COURT: Okay. Very well. Okay. Knowing that
2   then, what is your position as to sentencing?
3       MR. ROMO MATIENZO: Sentence can be -- we have other
4   things we want to bring up to the Court, but as to those two the
5   Court pointed out we don't have objection as to that.
6       THE COURT: That is favorable to you. Up to now it's
7   favorable.
8       MR. ROMO MATIENZO: But we have a motion that defendant
9   wants to file himself. It's the motion to dismiss the indictment
10  or to preserve the issue, it's --
11      THE COURT: Mr. Gil?
12      MR. ROMO MATIENZO: Mr. Gil's appointment.
13      THE COURT: Very well.
14      MR. ROMO MATIENZO: And the other thing is that we
15  found exception to the pretrial sentence report where it says
16  that Armando Garcia Garcia, was characterized as a triggerman.
17  And there was evidence that he was in a car when Oscarito was
18  killed. The car that supposedly took the two persons who
19  actually killed Canillo. But he was never actually -- maybe in
20  the police reports before the trial, but in the actual trial
21  there was no evidence as to pointing Mr. Armando Garcia as the
22  triggerman.
23      THE COURT: In other words, he didn't actually shoot?
24      MR. ROMO MATIENZO: He didn't actually shoot. That's
25  the evidence that he was with the persons who shot Oscarito and

12

1   that he was driving the car. That was the evidence.
2       THE COURT: Well, let me hear the position of the
3   United States as to that.
4       MS. RODRIGUEZ COSS: We disagree. I think that the
5   evidence was clear, that four individuals planned this death at
6   Barriada Bitumul and all four of them got inside that car with
7   the intent to go looking for this person and kill him. I think
8   that makes him a triggerman.
9           That's not the only instance in which Armando
10  Garcia Garcia conducted himself in that fashion. He's also one
11  of the individuals who went to Fajardo looking for Pitito in
12  order to kill him. And that was another instance where this
13  person formed part of a plan to kill another human being.
14          In addition to that, he possessed weapons during
15  the course of conspiracy, Your Honor, as one of the individuals
16  who stood guard at the drug points. And there is evidence in the
17  record to that effect. So, we would object to the PSI being
18  changed to reflect that Armando Garcia Garcia was not a
19  triggerman.
20      THE COURT: All right. The request that the PSI be
21  amended not to show that he was a triggerman is denied. The
22  Court does recall that, in fact, the testimony of the cooperator
23  was precisely that these four individuals went to look for this
24  person, and whether or not he fired the shots or not, fine,
25  that's clear. We don't know if he was the one who fired the

13

1  shots.  But the evidence to the Court tends to indicate that he
2  was in the car when the shots were fired and he was looking for
3  them -- and they were looking for him.  So, I really cannot order
4  the amendment of that.
5          MR. ROMO MATIENZO:  That was our position, Your Honor.
6  We accept the ruling of the Court.
7          THE COURT:  All right.  Is there any objection as to
8  the criminal history of the defendant?
9          MR. ROMO MATIENZO:  The criminal history we requested
10 that it be amended and I believe it was amended to level four,
11 yes.
12         THE COURT:  Why is it level four.
13         PROBATION OFFICER:  Miriam Figueroa.
14         THE COURT:  Thank you.
15         PROBATION OFFICER:  Your Honor, on page nine, in 1990
16 he was sentenced to Article 95, and he got two points for that.
17 On page 10, it reflects that he was also sentenced for violation
18 of Article 404, controlled substance at the local level.  And he
19 was --
20         THE COURT:  That was in Arecibo, right?
21         PROBATION OFFICER:  That is correct, Your Honor.
22         THE COURT:  And those facts are away from the
23 conspiracy in this case.
24         PROBATION OFFICER:  That is correct, Your Honor.
25         THE COURT:  All right.  So that's five points.

14

1          PROBATION OFFICER:  That's five points.  Strike-in
2  paragraph 28.  It states that "Since the defendant committed the
3  instant offense while under an actual criminal justice sentence
4  points were added."  And since the defendant committed the instant
5  offense less than two years after release from imprisonment, an
6  the sentence of May 10, 1991 another two points were added.  So
7  comes up to" Your Honor, eight points plus two criminal
8  history category of four.
9          THE COURT:  Eight points with a criminal history
10 category of four.
11         PROBATION OFFICER:  Yes, Your Honor.
12         THE COURT:  What is the range at five and 49?
13         PROBATION OFFICER:  Level 40.  The range comes up to
14 360 to life.
15         THE COURT:  He's still facing life.  What happened to
16 the state murder charges?  United States?
17         MS. RODRIGUEZ COSS:  I'm not aware.  I'm not aware of
18 that status, Your Honor.
19         MR. ROMO MATIENZO:  I believe some other person was
20 charged and convicted for the crime of Oscario.
21         I don't remember Pito Salsa's real name, but Pito
22 Salsa --
23         MS. RODRIGUEZ COSS:  Luis Torrens Alicea.
24         MR. ROMO MATIENZO:  Luis Torrens Alicea and some other
25 person were charged and I believe the other person were

1  convicted.

2        THE COURT: May I have the position of the United

3  States.

4        MS. RODRIGUEZ COSS: As to, Your Honor, what the

5  appropriate sentence should be in this case?

6        THE COURT: Yes.

7        MS. RODRIGUEZ COSS: I think the Court is aware that we

8  understand that the sentence in this case should be life

9  imprisonment for a number of reasons. This defendant was a

10 member of a very violent drug conspiracy, Your Honor. In

11 addition to the fact that the presentence investigation report

12 places him at a level 40, with a criminal history category of

13 four, exposing him to life imprisonment sentence.

14       We understand that if the guidelines enhancement,

15 which was approved just a month after sixteen year old Oscar

16 Nazario was brutally killed by this defendant and four other

17 individuals, this defendant would be looking at a mandatory life

18 imprisonment sentence. So, we understand the Sentencing

19 Commission that approved the United States Sentencing Guidelines

20 would support a life sentence in this case, because it is the

21 policy of the government, Your Honor, that an individual who

22 murdered a person within a drug conspiracy such as the one

23 charged in this case be sentenced to life imprisonment.

24       But in this case, Your Honor, there are other

25 aggravators, not just the murder of Oscar Nazario Rivera. You

15

---

1  have another 12 murders which were undertaken by this

2  organization which were proven at trial. Murders which span from

3  1990 through the end of 1993, ending, of course, with the murder

4  of Oscar Nazario.

5        ~~conspiracy through not whatever people speak of during that~~

6  ~~Fernando Garcia Garcia was a member of that conspiracy was aware of that.~~ In other

7  words, he as a member of the conspiracy was aware of the violent

8  nature because he himself engaged in that violence. He possessed

9  weapons in furtherance of the conspiracy. He saw others possess

10 weapons. He knew of the other murders that had been undertaken

11 in order to further the goals of the conspiracy charged in this

12 indictment.

13       Notwithstanding that fact, he chose to continue to

14 participate in those acts, all the way up to October 1993 when he

15 himself participated in the murder of another human being. And

16 Your Honor, I think it's worth noting that, that other human

17 being who was killed in October of 1993 was a sixteen year old

18 boy. I think probably out of the 12 murders that were undertaken

19 by this conspiracy that one deserves mention, because of the age

20 of the victim.

21       In addition to that, Your Honor, a defendant

22 stands before this Court who's been through the justice system

23 before. ~~Part of the reason that he has a criminal history~~

24 ~~category four is because of the prior criminal history~~,

25 ~~and not withstanding the fact that those convictions had been~~ --

16

17

1  ~~had sentences imposed be continued to participate in the~~
2  ~~conspiracy charged in this case.~~
3          Now, so the Court has to also take into
4  consideration the fact that apparently, Your Honor, this
5  defendant does not know the meaning of the word rehabilitation.
6  He was given more than one opportunity before the trial in this
7  case to correct his behavior. His incredibly anti social
8  behavior. He was given that opportunity by the state system.
9  And he chose to continue his life of crime. And based upon that
10  will fact, based upon the violent nature of this organization,
11  based upon the violent acts that this defendant himself
12  participated in, the United States most definitely is requesting
13  that this Court sentence the defendant to life imprisonment.
14          THE COURT: I'm going to let you have the last word
15  before I hear allocution from the defendant.
16          MR. ROMO MATIENZO: Yes. Your Honor, all the points, I
17  mean, all the points brought out by the government just right now
18  are considered in the sentencing guideline. They are already
19  that he has prior, they're already included he went up to
20  criminal history four, it's considered. What she just said right
21  now consider this, consider that, that is considered. That's why
22  he goes up to category four because it's considered. What she is
23  asking, the government is asking to consider it even further and
24  the law that wasn't applied, that didn't exist when Oscarito, she
25  said, forget about expo facto, also consider it. Even consider

18

1  it even further.
2          THE COURT: But let us assume for one second, as the
3  Court should and the Court does, because I have not hesitated in
4  sentencing defendants. One of them ended up any way with a
5  life because he had a leadership role that the Court had to put
6  in, plus he had a weapon that brought him up to 43, anyway.
7  Right.
8          But assuming, as the Court has to assume, at this
9  moment, that the mandatory 43 does not reach, is not reachable
10  here. The mandatory 43, because the mandatory three was enacted
11  in November of 1993, and these murders occurred sometime
12  thereafter -- sometime before. Excuse me. Sometime before.
13          So, even assuming that, wouldn't the Court
14  consider as an aggravating and tending to push it to the upper
15  end, the fact that there were 12 murders in this conspiracy.
16  That's no where here, nor the fact that himself participated in a
17  murder, and the fact that at the end of the conspiracy he showed
18  his proclivity towards violence in that he went out looking still
19  for another guy to murder. Wouldn't I use those factors to give
20  him the higher end rather than the lower end, I ask you.
21          MR. ROMO MATIENZO: Your Honor, if he actually had
22  killed anybody, you would have to consider going up and not going
23  down. But he didn't actually kill anybody. Even believing all
24  the testimony against him.
25          THE COURT: Assuming that I believe and giving him the

19

1  doubt that he was not one of the persons who shot.  He was still

2  in the car that left Bitumul with a purpose to kill somebody,

3  wherever he was, he happened to be in Floral Park, get him and

4  kill him.  And wasn't he in the car that went to Fajardo, also,

5  in the two cars that went to Fajardo, also to attempt to find

6  this other gentleman to kill him.  They were lucky.  They didn't

7  kill him.  But anyway, wasn't he there?

8       MR. ROMO MATIENZO:  There was evidence as to that.

9       THE COURT:  There was evidence.  I don't know if he was

10 there or not.  But he was there pursuant to the evidence.  Okay.

11      MR. ROMO MATIENZO:  Yes, Your Honor, it would justify a

12 lower end if he was a leader that organized that, that he was the

13 one in charge of this organization.  But he wasn't at that level,

14 Your Honor.  The punishment should be higher to the ones higher;

15 sometimes it doesn't go that way because the persons who most

16 kill were the witnesses of the government and sometimes it

17 doesn't work that way.  But, I believe if the person was the

18 leader and actually killed that person should get life.  But the

19 person who --

20      THE COURT:  So, the intellectual does not get anything,

21 just the triggerman?

22      MR. ROMO MATIENZO:  The intellectual also should get --

23      THE COURT:  For example, if my role is merely driving

24 the car but I know for sure that they're going to kill him, my

25

20

1  job is to drive the car I shouldn't get it, just the people who

2  actually does the firing?  Is that the law?

3       MR. ROMO MATIENZO:  The evidence could have been that

4  he was driving the car, got off the car and shot somebody.  If

5  that really made him to get life imprisonment, Your Honor, that

6  would put him in a position that I couldn't even open my mouth

7  here.

8       THE COURT:  You couldn't if the death would have been

9  after 1993.  If the event after occurred after 1993.  But you did

10 open your mouth and you did point out to the Court that there is

11 no mandatory 43 in this case, which is correct.  At least I

12 interpret it that way, although the U.S. does not.

13      I want you to know that their position is that

14 since the conspiracy went beyond 1993, November 1993, that I

15 could really use that enhancement.  But I'm giving him the

16 benefit of the most liberal interpretation to him.  However, the

17 fact is, that there are a lot of aggravating circumstances that

18 this case has which are not taken care of by the mere application

19 of the offense levels rules nor by mere application of the

20 criminal history rules.

21      MR. ROMO MATIENZO:  Yes, Your Honor.  But a level at

22 360 months, well, meaning 30 years, he will come out an old man,

23 Your Honor.  That's more than punishment.  Whatever -- the other

24 way he's going to come out dead.

25      THE COURT:  I'm going to hear allocution now from the

21

1  defendant.
2       MR. ROMO MATIENZO:  He might say some words, but this
3  is the filed motion.
4       THE COURT:  Well, the record -- as to the filed motion
5  of Guillermo Gil.  May I see it.  U.S. Attorney Guillermo Gil.
6  Okay.
7            His position is that he does not want to use his
8  right of allocution?
9       THE DEFENDANT:  At least I would tell you that before
10  you impose sentence I'd like you to consider that I have five
11  children that depend on me, my family.  That is all.
12       THE COURT:  Okay.  The Court accepts the filing in a
13  pro se fashion, although the Court's ruling in this case has been
14  that there being an attorney, motions have to be filed through an
15  attorney but I understand that this matter is to preserve the
16  issue.  And the Court accepts the filing without your signature.
17  It is order to be filed and docketed.  The Court will recess
18  briefly.
19            (SHORT RECESS)
20       THE COURT:  On June -- is there any reason why the
21  Court should not at this time proceed to sentencing?
22       MR. ROMO MATIENZO:  No reason that we know.  Our only
23  request is that our client Armando Garcia Garcia be sentenced at
24  the lower end of the guideline.
25       THE COURT:  Thank you.  On June 25, 1999, the defendant

22

1  Armando Garcia Garcia was found guilty by a jury trial to count
2  two of the superseding indictment in Criminal Case Number 97-076,
3  which charges violation of Title 21, U.S.C. Section 846.
4            Based on United States Guideline 2D1.1, and the
5  amount of drugs involved in the instant offense a base level of
6  38 was determined.  The level is determined by the Court, either
7  by 1.5 kilograms of crack cocaine, which was distributed by the
8  conspiracy and was reasonably foreseen by the defendant or by the
9  150 kilograms of cocaine -- or by 150 kilograms of cocaine easily
10  reachable by the bust of drugs stolen in Fajardo, brought to the
11  Bitumul conspiracy.  That was known throughout the trial as the
12  "palo" in Fajardo.  The criminal history category is not disputed
13  in this case, but it is criminal history category of four.
14            As the defendant has not accepted responsibility
15  for his involvement in the offense conduct there are no further
16  applicable guidelines.  Based on a total offense level of 40 and
17  a criminal history category of four, the guideline imprisonment
18  range in this particular offense is from 360 months to life, with
19  a fine range of twenty-five thousand to four million, plus a
20  supervised release term of at least five years.
21            Given defendant's participation in the offense
22  conduct, wherein he showed proclivity towards violence, shown by
23  the fact that he was one of the persons who mounted a car to kill
24  Cesar Oscar Nazario, and also at the end of the conspiracy he
25  also mounted a car to kill another person, all related to the

23

1   drugs, and that in the instant offense the conspiracy involved 12

2   murders which were foreseeable to the defendant pursuant to

3   United States Guideline 1B1.3 of relevant conduct a sentence at

4   the upper end of the guideline range is merited.

5          Therefore, it is the judgment of the Court that

6   the defendant is hereby committed to the custody of the Bureau of

7   Prisons to be imprisoned for life.

8          Having considered the defendant's financial

9   condition a fine is also not imposed.

10         If the defendant is ever released from custody he

11  shall be placed on supervised release for a term of five years

12  under the following terms and conditions.

13         One:  The defendant shall not commit another

14  federal, state or local crime and shall observe the standard

15  conditions of supervised release recommended by the United States

16  Sentencing Commission and adopted by this Court.

17         Two:  The defendant shall not unlawfully possess

18  controlled substances, firearms, destructive devices or other

    dangerous weapons.

19         Three:  The defendant shall refrain from any

20  unlawful use of a controlled substance and submit to one drug

21  test within fifteen days of release on probation or supervised

22  release for the use of controlled substance and thereafter, as

23  required by the U.S. Probation officer.

24         A special monetary assessment -- is a special

25


24

1   monetary assessment of fifty dollars imposed?  It shouldn't be

2   imposed.  He did not plead guilty.

3          PROBATION OFFICER:  Excuse me, Your Honor?

4          THE COURT:  This is not a plea case.  Why is the fifty

5   dollar monetary assessment imposed?  It's placed no matter what

6   happens.

7          PROBATION OFFICER:  That's correct.

8          THE COURT:  A special monetary assessment in the amount

9   of fifty dollars is also imposed.

10         Sir, you have a right to appeal since you were

11  found guilty after a plea of not guilty.  The notice of appeal

12  shall be filed in the district within -- in this district court

13  within ten days from today, when the judgment of the Court will

14  be entered.

15         You have a right to apply for leave to appeal in

16  forma pauperis if you are unable to pay the cost of an appeal.

17  If you are represented by court appointed counsel he will

18  continue to represent you through appeal, if any, unless a

19  substitute counsel is later appointed.  You will be given credit

20  for your sentence for any days spent in federal custody in

21  connection with the offenses for which the sentence has been

22  imposed.

23         We have to advise for the record that the

24  transcript of the sentencing proceedings is to be forwarded to

25  the United States Sentencing Commission.

1  Anything further?

2  MR. ROMO MATIENZO: No, Your Honor, we request that

3  copy of the transcript be authorized to defendant.

4  THE COURT: It will be and it is. The Court orders

5  that a copy of the transcript be provided under the CJA rules to

6  defendant's counsel Mr. Romo Matienzo.

7  Anything further from the United States?

8  MR. ROMO MATIENZO: Nothing further.

9  MS. RODRIGUEZ COSS: Nothing further.

10  THE COURT: Anything further from the defendant?

11  You're excused.

12  MR. ROMO MATIENZO: Thank you, Your Honor.

13  *********************

25

---

1  THE CLERK: Criminal case 97-76, United States of

2  America versus Armando Garcia Garcia.

3  THE COURT: Okay. Criminal number 97-76.

4  (SHORT PAUSE IN PROCEEDINGS)

5  THE COURT: Take him away. George, don't take him to

6  MDC until we find out where his lawyer is. Has he left?

7  Will you check to see that he doesn't leave.

8  THE MARSHAL: Very well.

9  THE COURT: Let's proceed with his sentencing.

10  All right, Mr. Rivera. I'm going to take a

11  recess.

12  THE COURT: Okay.

13  (SHORT RECESS)

14  The Court authorized the late filing of the

15  Guillermo Gil matter, but the Court did not dispose of that

16  motion.

17  The Court disposes of that motion in the exact

18  same way as the Court disposed of that motion when it was made in

19  the case of United States of America versus Lorenzo Munoz Franco

20  95-0386, wherein basically the Court adopted the opinions of

21  Judge Fuste in United States versus Curry Perez, 47 federal

22  supplement 2nd 164, United States versus Solomayor Vazquez at

23  97-091, and also the United States versus Santana and the

24  decision of Judge Laffitte at United States versus Rodriguez Sosa

25  97-257, and Judge Perez Gimenez at United States versus Ruiz Rio

26

27

1    99-118.

2              So, the motion is denied for that reason. Also

3    recently Judge Perez on 17 February, entered an order in United

4    States versus Roberto Ruiz Rio stating that even though he found

5    that there was no infirmity in the appointment of Mr. Gil either

6    from its inception or by the virtue of the time that has elapsed

7    that, notwithstanding even if there were some infirmity that the

8    infirmity did not reach the level which required that the

9    indictments be dismissed.

10             I have copies of both of these cases here and I am

11   providing a copy of them and ordering the secretary to

12   incorporate them by reference into the file in this disposing of

13   the matter.  Okay.

14             Now, please give him a copy of the decision and

15   place a copy of the decision on the record.  So, I need at least

16   two copies and leave one copy here because this is a matter that

17   is going to keep on occuring for the next few weeks.  Okay.

18             Since I disposed now of the motion I will

19   technically proceed with sentencing and sentencing would be

20   exactly the same as have already elapsed.  Anything further?

21             MR. ROMO MATIENZO:  Nothing further, just that this

22   part of the transcript be --

23             THE COURT:  Incorporated in to the transcript.

24             Thank you very much.

25             MR. ROMO MATIENZO:  Thank you.

28

1              THE COURT:  You're excused.

2              MR. ROMO MATIENZO:  Thank you.

3                        ***********

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

29

REPORTER'S CERTIFICATE

I, ARTHUR G. PINEDA, Official Court Reporter for the United States District Court for the District of Puerto Rico, appointed pursuant to the provisions of Title 28, United States Code, Section 753, do hereby certify that the foregoing is a true and correct computer aided transcript of proceedings had in the within-entitled and numbered cause on the date hereinbefore set forth; and I do further certify that the foregoing transcript has been prepared by me or under my direction.

ARTHUR G. PINEDA
Official Court Reporter

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

ARMANDO  GARCIA - GARCIA,

Petitioner

- vs -

UNITED  STATES  OF  AMERICA

Respondent

PETITIONER'S EXHIBIT 

[ IN RE: 28 U.S.C. §2255 ]

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

Appeal No. 01-1619
UNITED STATES OF AMERICA,
Plaintiff-Appellee,
v.
WILLIAM SOTO-BENIQUEZ,
Defendant-Appellant

Appeal No. 01-1674
UNITED STATES OF AMERICA,
Plaintiff-Appellee
v.
JUAN SOTO-RAMIREZ,
Defendant-Appellant

Appeal No. 00-1547
UNITED STATES OF AMERICA,
Plaintiff-Appellee
v.
EDUARDO ALICEA-TORRES,
Defendant-Appellant

Appeal No. 01-1620
UNITED STATES OF AMERICA,
Plaintiff-Appellee
v.
RAMON FERNANDEZ-MALAVE,
Defendant-Appellant

Appeal No. 00-1464
UNITED STATES OF AMERICA,
Plaintiff-Appellee
v.
CARMELO VEGA-PACHECO,
Defendant-Appellant

Appeal No. 00-1488
UNITED STATES OF AMERICA,
Plaintiff-Appellee
v.
ARMANDO GARCIA-GARCIA,
Defendant-Appellant

Appeal No. 00-1470
UNITED STATES OF AMERICA,
Plaintiff-Appellee
v.
JOSE LUIS DE LEON-MAYSONET,
Defendant-Appellant

Appeal No. 00-1362
UNITED STATES OF AMERICA,
Plaintiff-Appellee
v.
RENE GONZALEZ-AYALA,
Defendant-Appellant

Appeal No. 00-1543
UNITED STATES OF AMERICA,
Plaintiff-Appellee
v.
JUAN ENRIQUE CINTRON-CARABALLO,
Defendant-Appellant

Appeal No. 00-1361
UNITED STATES OF AMERICA,
Plaintiff-Appellee
v.
MIGUEL VEGA-COLON,
Defendant-Appellant

Appeal No. 00-1456
UNITED STATES OF AMERICA,
Plaintiff-Appellee
v.
MIGUEL VEGA-COSME,
Defendant-Appellant

# ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO

## BRIEF FOR APPELLEE

**H. S. GARCIA**
**United States Attorney**

**Sonia I. Torres-Pabón**
**Assistant United States Attorney**
**Chief, Criminal Division**

**Jacabed Rodríguez-Coss**
**Michelle Morales**
**Assistant United States Attorneys**
**Torre Chardón, Room 1201**
**350 Carlos Chardón Avenue**
**San Juan, Puerto Rico 00918**
**Tel. (787) 766-5656**

over time, there was nevertheless one overarching conspiracy." See, e.g., United States v. Shea, 211 F.3d 658, 665 (1st Cir. 2000).

Moreover, the record reflects the active participation of the three appellants in the conspiracy. After stealing the 200 kilos of cocaine in Fajardo with Rodriguez Lopez, Gonzalez-Ayala received profits from the sale of said cocaine in Bitumul. TT, 2/1/99, p. 89. He also worked at the table decking heroin and cocaine at Garcia-Garcia's house. TT, 2/1/99, p. 89; 4/15/99, p. 70.

As late as 1993, when De Leon-Maysonet was already 18, he would prepare decks of narcotics and store them in his residence. He also stored weapons in his residence for the 'safe keeping' of the conspiracy. TT, 2/1/99, p. 87; 3/25/99, p. 48.

Garcia-Garcia, on the other hand was an active participant in the conspiracy from beginning to end. The record reflects that he sold drugs at Cuba Street in 1990 and 1991. TT, 1/19/99, p.29; 1/21/99, pp.100, 130. He also participated in the Los Lirios shootings. TT, 1/20/99, p.17. Throughout 1992 and 1993, he "worked the table," that is, packaged drugs. TT, 1/26/99, p.13; 3/25/99, p.13.

**B.   The District Court Properly Admitted Evidence Regarding Murders Carried Out in Furtherance of the Conspiracy.**

Appellants further argue that the district court committed reversible error in admitting evidence of various murders that were unrelated to the charged conspiracy.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO


ARMANDO  GARCIA - GARCIA,

Petitioner


- vs -


UNITED  STATES  OF  AMERICA

Respondent


PETITIONER'S EXHIBIT  


[ IN RE: 28 U.S.C. §2255 ]

# United States Court of Appeals
## For the First Circuit

—————

Vol. I of II

No. 01-1619

UNITED STATES OF AMERICA,

Appellee,

v.

WILLIAM SOTO-BENÍQUEZ,

Defendant, Appellant.

—————

No. 01-1674

UNITED STATES OF AMERICA,

Appellee,

v.

JUAN SOTO-RAMÍREZ,

Defendant, Appellant.

—————

No. 00-1547

UNITED STATES OF AMERICA,

Appellee,

v.

EDUARDO ALICEA-TORRES,

Defendant, Appellant.

—————

No. 00-1470

UNITED STATES OF AMERICA,

Appellee,

v.

JOSE LUIS DE LEÓN MAYSONET,

Defendant, Appellant.

———————————

No. 00-1362

UNITED STATES OF AMERICA,

Appellee,

v.

RENE GONZALEZ-AYALA,

Defendant, Appellant.

———————————

No. 00-1543

UNITED STATES OF AMERICA,

Appellee,

v.

JUAN ENRIQUE CINTRÓN-CARABALLO,

Defendant, Appellant.

———————————

No. 00-1361

UNITED STATES OF AMERICA,

Appellee,

v.

MIGUEL VEGA-COLÓN,

Defendant, Appellant.

_____

No. 00-1456

UNITED STATES OF AMERICA,

Appellee,

v.

MIGUEL VEGA-COSME,

Defendant, Appellant.

_____

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO
[Hon. Daniel R. Domínguez, U.S. District Judge]

_____

Before

Selya, Circuit Judge,
Coffin, Senior Circuit Judge,
and Lynch, Circuit Judge.

_____

Marlene Apontes-Cabrera for appellant Soto-Beníquez.
Miriam Ramos-Grateroles for appellant Soto-Ramírez.
Raymond Rivera Esteves for appellant Alicea-Torres.
Luz M. Rios-Rosario for appellant Fernández-Malavé.
Javier Morales-Ramos for appellant Vega-Pacheco.
Rachel Brill for appellant García-García.
Roberto Roldan-Burgos for appellant de León Maysonet.
Victor Miranda-Corrada, for appellant Gonzalez-Ayala.
Rafael Anglada-Lopez for appellant Cintrón-Caraballo.
Marcia G. Shein for appellants Vega-Cosme and Vega-Colón.

Jacabed Rodriquez-Coss and Michelle Morales, Assistant United States Attorneys, with whom H.S. Garcia, United States Attorney, and Sonia I. Torres-Pabon, Assistant United States Attorney, were on brief, for appellee.

---

November 20, 2003

---

Soto-Ramírez and Soto-Beníquez were the leaders of the operation. Soto-Ramírez operated or supplied almost all of the drug points. His house at Callejón Dos was used by various defendants to prepare crack and heroin for distribution at the six drug points and to store weapons to defend and acquire territory for the drug points. When defendant Miguel Vega-Cosme established his drug point on Laguna Street with his son, defendant Miguel Vega-Colón, he first requested permission from Soto-Ramírez.

Soto-Beníquez served as the triggerman and principal supplier. He ultimately supplied most of the narcotics sold at the drug points and owned many of the weapons used to kill rival gang members. Cesário-Soto described him as "one with ranks" in the drug world.

The remaining defendants were involved in running one or more of the six drug points. Eduardo Alicea-Torres sold drugs at the Cuba Street and Callejón Dos drug points from 1990 until at least 1991, and later began his own drug point. Ramon Fernández-Malavé packaged crack and cocaine for Soto-Ramírez and cooperating government witness Negrón-Maldonado in 1992. Carmelo Vega-Pacheco packaged drugs for Soto-Ramírez and Negrón-Maldonado through 1992, and sold narcotics at the Cuba Street drug points in 1990 and 1991. Armando García-García sold narcotics at the Cuba Street drug points from 1990 to 1991, packaged drugs in 1992, and sold drugs at Callejón Nueve in 1993. From 1990 to 1992, Jose de León Maysonet

-10-

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO


ARMANDO   GARCIA - GARCIA,

Petitioner


- vs -


UNITED STATES OF AMERICA

Respondent


PETITIONER'S EXHIBIT  


[ IN RE: 28 U.S.C. §2255 ]

Nos. 00-1488, 00-1470, & 00-13___
IN THE UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

---

UNITED STATES OF AMERICA,
Appellee,
v.
ARMANDO GARCIA GARCIA,
Defendant, Appellant.

---

UNITED STATES OF AMERICA,
Appellee,
v.
JOSE LUIS DE LEON MAYSONET,
Defendant.

---

UNITED STATES OF AMERICA,
Appellee,
v.
RENE GONZALEZ AYALA,
Defendant.

---

ON APPEAL FROM A JUDGMENT OF THE UNITED STATES
DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO
(Hon. DANIEL R. DOMINGUEZ, United States District Judge)

---

**CONSOLIDATED BRIEF FOR THE APPELLANTS**

---

RACHEL BRILL
For Armando Garcia Garcia
Suite 1113, Mercantil Plaza Building
Ponce de Leon Avenue
San Juan, PR  00918
Tel. (787) 753-6131

ROBERTO ROLDAN BURGOS
For Jose Luis De Leon Maysonet
Darlington, Suite 800
1007 Munoz Rivera Avenue
San Juan, PR  00925
Tel: (787) 630-3823

VICTOR MIRANDA CORRADA
For Rene Gonzalez Ayala
Westernbank World Plaza, Suite 1905
268 Munoz Rivera Avenue
San Juan, PR 00918
Tel: (787) 754-2005

Nos. 00-1488, 00-1470, & 00-1362

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico, this 8th day of April, 2003.

RACHEL BRILL
For Armando Garcia Garcia
Suite 1113, Mercantil Plaza Building
Ponce de Leon Avenue
San Juan, PR 00918
Tel. (787) 753-6131

ROBERTO ROLDAN BURGOS
For Jose Luis De Leon Maysonet
Darlington, Suite 800
1007 Munoz Rivera Avenue
San Juan, PR 00925
Tel: (787) 630-3823

VICTOR MIRANDA CORRADA
For Rene Gonzalez Ayala
Westernbank World Plaza, Suite 1905
268 Munoz Rivera Avenue
San Juan, PR 00918
Tel: (787) 754-2005